## KINNEY-COASTAL OIL COMPANY ET AL. *v.* KIEFFER ET AL.

No. 64. Argued October 25, 1927.—Decided June 4, 1928.

490

*Mr. Edward M. Freeman,* with whom *Mr. Paul P. Prosser* was on the brief, for petitioners.

The remedy provided by the Act of 1914 is not a legal action in the nature of condemnation proceedings by the oil and gas lessee against the surface owner to condemn the surface required for mineral exploitation; on the contrary, it is an action by the surface owner against the lessee (and his surety on the bond required) to recover judgment for the damages caused by the mineral exploitation to the crops and improvements of the surface owner. The remedy is for the sole benefit of the surface owner and is not available to the lessee. The lessee may take possession of the surface to the extent from time to time required, and the surface owner may then avail himself of this remedy against the lessee.

Under the construction of the Circuit Court of Appeals the lessee would be prevented from taking possession until the damages, if any, to be caused the surface owner by the mineral exploitation had been ascertained. Such a scheme would work great injury not only to the lessee but also to the United States, as the owner of the oil and gas, because of its royalty interest, and to the State, because of its share of the royalty. The oil might be lost meanwhile through drainage.

Again, the procedure indicated by the Circuit Court of Appeals is highly objectionable in that a jury would be asked to speculate upon damages which had not yet occurred, and the ascertainment of which would rest largely, if not entirely, upon conjecture. Moreover, it is possible that the surface owner might not be entitled to recover any damages whatsoever. No one would seri-

ously argue that the lessee would have to pay him for the mineral content; apparently the only damages recoverable would be for injury to crops and improvements. There might be no crops or improvements.

The suggestion that the United States or its lessee must purchase the surface or pay the surface owner compensation for its use is wholly untenable.

Upon the exhaustion of the oil and gas in the leased land, the estate of the United States and its lessees will terminate, including their incidental estate in the surface, since their only interest in that relates to the mining of the oil and gas. *Chartiers Block Coal Co.* v. *Mellon,* 152 Pa. 286; *Moore* v. *Indian Camp Coal Co.,* 75 Oh. St. 493.

Upon the grant or reservation of the mineral rights in land, even in the absence of an express provision, the owner of the mining right is entitled, as an appurtenant to such grant or reservation, to the use of the surface reasonably necessary to extract and remove the minerals. 2, Snyder on Mines, 848 et seq.; Mills-Willingham, Law of Oil and Gas, 250; 40 C. J., 984; *Marvin* v. *Brewster Iron Mining Co.,* 55 N. Y. 538; *Chartiers Block Coal Co.* v. *Mellon,* supra; *Porter* v. *Mack Mfg. Co.,* 65 W. Va. 636; *Lovelace* v. *Southwestern Petroleum Co.,* 267 Fed. 513. Congress was merely acting from abundance of caution in expressly providing for the use of the surface.

The Department of the Interior has followed this construction. Compare the procedure prescribed by the Stockraising Homestead Act, 39 Stat. 862.

The conduct of the respondents was wrongful and in violation of petitioners' rights; the petitioners had no plain, adequate and complete remedy at law; the alleged statutory remedy provided by the Act of 1914 was doubtful; therefore, the District Court, sitting as a court of equity, had jurisdiction and its decree was proper.

500

*Mr. C. D. Murane,* with whom *Messrs. G. R. Hagens* and *R. H. Nichols* were on the brief, for respondents.

A person cannot be enjoined from doing a lawful act unless the act is being done unnecessarily and maliciously to vex, annoy and injure another. There can be no contention that the respondents were acting maliciously or otherwise than in the honest belief that they were exercising a legal right. They own the fee simple to this land, they have a right to cultivate it, build houses upon it, sell it as a whole or in part; the only restriction placed upon them by their patent is that others shall have the right to occupy so much of the surface as is actually necessary to prospect for, mine and remove the oil and gas " upon payment of damages caused thereby to the owner of the land." The Court will not, by its injunction, deprive respondents of any of the beneficial rights granted to them by their patent.

An injunction will not be granted when a greater injury will be done thereby to defendant than would be done to the plaintiff by denying it. The statutes provide for an action at law in cases of this character; the mine lease owner must pay the damage caused; and if the parties cannot agree upon the amount of damages, then the matter should be tried by a jury in a court of law, competent to ascertain and fix them.

If we were to assume that petitioners had the right to this land without compensation, they offered no evidence to show that they had ever made a demand for possession of any portion of it and been refused. Respondents, moreover, proved that possession was never denied and that respondents never had any intention of denying it— their only intention being to require petitioners to pay such reasonable damage as they may cause to respondents' lands and improvements. A court of equity will not interpose to protect a person from a groundless fear.

There are two distinct situations contemplated in the Act of July 17, 1914, and the Leasing Act of February 25, 1920, was enacted with those two conditions in mind. The first condition is where a prospecting permit is issued upon lands patented with the oil rights reserved to the Government. This permit is issued for a period of two years and is temporary in character. It was not contemplated that, under it, actual appropriation of any of the land would be necessary but only a temporary possession for the drilling of one or two wells, and that just compensation to the owner of the surface would be made for the damage done to crops or improvements by the holder of the permit. The other situation contemplated a lease which was to extend for a period of twenty years, and subject to renewal for ten-year periods. The possession would be for so long a time that it amounted to an appropriation of the amount of land actually necessary for drilling operations, production, and the removal of oil and gas. Therefore, the oil and gas lessee is required to pay for the actual damage done to the owner of the land.

He has an election, after his discovery, as to whether it will be to his advantage to mine and remove the oil, and pay the damages caused to the surface owner, or the " owner of the land," as said in the statute, or abandon his oil and gas lease. The owner of the land has no election except that he may require the lessee to designate what portion of his land will be necessary for the use of the oil lessee in mining and removing, and to pay him all such damages as he may sustain, before he will be permitted to use the surface. In both of these cases an adequate means is provided for ascertaining the damage.

If the injunction were reinstated as granted by the trial court, Kieffer's patent would be a " scrap of paper," conferring no beneficial rights, despite payments to the Government for the lands and his outlay for improvements. So far as these lands are concerned, under this decree, re-

spondents' only right is the privilege of paying county and state taxes for the next twenty years.

Petitioners' contention during the trial of the cause, and the findings of the court, were to the effect that respondents can only use the land for agricultural purposes. They introduced testimony to show that they needed all of the surface for their drilling, development and production of oil, and the court made a finding that all was necessary for that purpose. If this be true, no part of the land would be available for crops; the entire tract would be appropriated by petitioners, and the exclusive possession, without any compensation whatsoever to the owner of the fee.

How can the surface owner be advised of the amount of land required for drilling and production purposes? Must he stand by for the twenty-year period with the pleasure of paying the taxes upon the land, to ascertain the needs of the lessee? A more reasonable interpretation of the statute is that the lessee must negotiate with the surface owner as to the value of the land, quantity required, and quantity required for drilling, etc., and that if they cannot agree, then the lessee must bring his action as indicated in the law of 1914, alleging the quantity of land which he requires, and asking a court of competent jurisdiction to call a jury to assess the damage that the surface owner will sustain.

By the decree which petitioners desire to have reinstated a Bank has been enjoined from receiving payments upon contracts of sales of portions of this land, the County Clerk has been enjoined from receiving deeds, town plats or other conveyances or evidences of title, a Utilities Company has been enjoined from laying pipe lines, with the permission of Kieffer, over his land for the purpose of conducting water and gas. In what way do these acts hinder or prevent drilling for the production of oil? The Utilities Company is even commanded to remove its pipe lines already laid, and there is not one

word of testimony that it has in any way interfered with operations of the petitioners. Cf. *Brookshire Oil Co.* v. *Casmalia Ranch and Oil Development Co.,* 156 Cal. 211; Lindley, Mines, 3d. ed., § § 814, 827; *Chartier's Block Coal Co.* v. *Mellon,* 152 Pa. 286; *Williams* v. *South Penn Oil Co.,* 52 W. Va. 181; *Globe Newspaper Co.* v. *Walker,* 210 U. S. 356; *Haycraft* v. *United States,* 22 Wall. 81; *The Harrisburg,* 119 U. S. 199; *Van Norton* v. *Morton,* 99 U. S. 378; *New Orleans* v. *Construction Co.,* 129 U. S. 45.

The right of Kieffer to have his damages determined by a jury and paid or secured as the statute directs, is a legal right given him by the Act of July 17, 1914. If the parties cannot agree, the surface owner in possession has a constitutional right to a trial by jury before his possession could be disturbed. *Singer Sewing Machine Co.* v. *Benedict,* 229 U. S. 481; *Travelers Protective Ass'n* v. *Gilbert,* 111 Fed. 269; *Union Pacific R. R. Co.* v. *Board of Comm'rs,* 222 Fed. 651; *Traction Co.* v. *Mining Co.,* 196 U. S. 239; *Kohl* v. *United States,* 91 U. S. 367; *Filbin* v. *United States,* 265 Fed. 354.

A court of equity has no jurisdiction where a "plain, adequate and complete remedy may be had at law." Rev. Stats., § 723; Comp. Stats., § 1244; *United States* v. *Bitter Root Co.,* 200 U. S. 451.

We desire to call the Court's attention to the specific provision of the statute which says " upon paying the damage caused to the owner." That is a condition precedent to his right to operate, and justly so. *Courtright* v. *Deeds,* 37 Ia. 503; *Sands* v. *McClelan* (N. Y.) 6 Cow. 582; *Little* v. *Wilcox,* 119 Pa. St. 439; *Appeal of Conrow* (Pa.) 3 Atl. 13.

MR. JUSTICE VAN DEVANTER, after making the foregoing statement of the case, delivered the opinion of the Court.

The findings of fact by the district court before described have such support in the evidence that they should

be accepted by us. Two were accepted by the circuit court of appeals, as shown in the quotation before made from its opinion, and the others were not considered. Those not considered are equally well supported.

The chief question presented is whether the act of 1914 prescribes an exclusive remedy at law applicable to the situation disclosed and thus prevents the plaintiffs from suing in equity, as held by the circuit court of appeals.

The acts of 1914 and 1920 are to be read together—each as the complement of the other. So read they disclose an intention to divide oil and gas lands into two estates for the purposes of disposal—one including the underlying oil and gas deposits and the other the surface—and to make the latter servient to the former, which naturally would be suggested by their physical relation and relative values. The act of 1914, in providing for the disposal of the surface, directs that there be a reservation of the oil and gas deposits, " together with the right to prospect for, mine and remove the same," meaning, of course, the right to use so much of the surface as may be necessary for such operations. And the act of 1920, in providing for the leasing of the oil and gas deposits, provides (§ 29) for a reservation of the surface " in so far as said surface is not necessary for the use of the lessee in extracting and removing the deposits." In effect therefore a servitude is laid on the surface estate for the benefit of the mineral estate to the end, as the acts otherwise show, that the United States may realize, through the separate leasing, a proper return from the extraction and removal of the minerals.

The lease held by the plaintiffs and the homestead patent issued to Kieffer were drafted in keeping with the acts thus understood. In both the required reservations are plainly expressed. Under the lease the plaintiffs have the right to extract and remove the oil and gas, as also the appurtenant right to use the surface so far as may

be necessary. In the homestead patent these rights are distinctly excepted and reserved from the estate thereby granted. Their exercise involves no taking of anything granted by the patent. Nor is the one who under the patent owns the surface, with those rights reserved, entitled to compensation for the minerals taken or the use made of the surface. The only compensation which he rightfully may demand is, as the act of 1914 says, for " damages caused " by the mining operations. The sentence next preceeding that in which these words occur makes it fairly plain that they refer to damages to " crops and improvements," and the title to the act, coupled with the reference to " crops " shows that " agricultural " improvements are the kind intended. Certainly it is not intended to include improvements placed on the land, after the mining operations are under way, for purposes plainly incompatible with the right to proceed with those operations until the oil and gas are exhausted. It well may be that, if the operations are negligently conducted and damage is done thereby to the surface estate, there will be liability therefor. But such liability will ensue, not from admissible mining operations and use of the surface, but from the inadmissible negligence causing the damage.

By this suit the plaintiffs are not seeking to acquire a right to use the surface but to protect from wrongful obstruction and impairment the right which they already have. Nor are they seeking to enforce their right to enter and begin mining operations. More than a year before the suit was begun they entered, took in mining equipment and supplies, erected houses for their workmen, began drilling for oil and gas and at large cost completed a producing well—all with the knowledge and acquiescence of Kieffer, then the sole surface claimant. After their operations were thus under way, Kieffer platted as a townsite the forty acres where they were operating and began

actively to sell and contract to sell the lots as platted; and
the purchasers began to erect buildings thereon for resi-
dential and business purposes. Kieffer was also contem-
plating taking like action as to the other forty acres. It
was then that the suit was begun. It is directed chiefly
against the sale and use of the surface for townsite pur-
poses and is based on the theory—sustained by the find-
ings made on the proofs submitted at the trial—that prac-
tically the whole eighty acres is within the producing
structure of the oil field, that use of practically the entire
surface is necessary for conducting reasonably efficient
operations under the lease and that the sale and occu-
pancy of the surface for townsite purposes will seriously
interfere with the plaintiffs' right to use the same in their
mining operations and will obstruct and impede the fur-
ther prosecution of those operations and thereby subject
the plaintiffs to continuing and irreparable injury.

With this understanding of the situation and of the
chief object of the suit, we think it plain that the plain-
tiffs were entitled to the interposition and aid of a court
of equity to prevent the threatened occupancy and use
of the surface for purposes incompatible with their right
to continue the mining operations under the lease and to
make any necessary use of the surface. Certainly they
were without the plain, adequate and complete remedy
at law which under § 267 of the Judicial Code precludes
resort to a suit in equity.

The circuit court of appeals based its decision on the
part of the act of 1914 which—after directing that the
patent for the surface estate shall contain a reservation of
the underlying oil and gas deposits, with the right to
prospect for, mine and remove the same—provides that
lessees of the United States may enter, occupy so much
of the surface as may be required, and mine and remove
the minerals, " upon payment of damages caused thereby
to the owner of the land, or upon giving a good and suffi-

cient bond or undertaking therefor in an action instituted in any competent court to ascertain and fix said damages."

The plaintiffs take the position that the bond given by the lessee and approved by the Secretary of the Interior when the lease was issued satisfied that provision. In this the plain words of the provision are neglected. They call for a bond to be given in a judicial proceeding wherein the damages may be ascertained and fixed. The circuit court of appeals so regarded them.

But we are unable to agree with that court's ruling that the provision requires that the bond be given and the damages assessed only in an action at law. The words of the provision are " an action instituted in any competent court;" and we think the matter is one which the district court was and is competent to deal with in this suit.

It is a general rule that a court of equity, in a suit of which it has and takes cognizance, may administer complete relief between the parties even though this involves the determination of legal rights which otherwise would not be within the range of its authority, *Camp* v. *Boyd,* 229 U. S. 530, 552; *McGowan* v. *Parish,* 237 U. S. 285, 296; *United States* v. *Union Pacific Ry. Co.,* 160 U. S. 1, 50, *et seq.* And under that rule a court of equity in awarding relief to one party may impose conditions protecting and giving effect to correlative rights of the other. *Walden* v. *Bodley,* 14 Pet. 156, 164; *Lynch* v. *Burt,* 132 Fed. 417, 432; *Burnes* v. *Burnes,* 137 Fed. 781, 791.

So, while the provision on which the decision of the circuit court of appeals rests cannot be held to be an obstacle to the maintenance of this suit in a court of equity, we think it shows a need for modifying the decree of the district court by providing therein for an ascertainment in this suit of any damages which the plaintiffs' entry and operations under the lease may have caused to the agricultural improvements or crops of the owner of the surface estate, and also by conditioning the relief awarded

the plaintiffs upon their giving a good and sufficient bond or undertaking to pay such damages within a limited time after the same are ascertained.

The evidence appears not to have been taken with a view to an ascertainment of the damages, but there is testimony tending to show that the owner of the surface is asserting a claim for damages done at the time the plaintiffs entered or soon thereafter. It of course is admissible to fix the damages by agreement. But if this be not done there will be need for a hearing on that question.

We conclude that the decree of the circuit court of appeals should be reversed and that the cause should be remanded to the district court with directions to modify its decree in accordance with what is said in this opinion.

*Decree of circuit court of appeals reversed.*
*Decree of district court modified.*